# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DANIEL SARAUER,
DARYL BARTSCH,
RANDALL BRACE,
JOANN CAPTAIN,
PETER ENGELEITER,
RANDOLPH KUBATSKI,
STEVEN LEITZKE,
MICHAEL STINEMATES,
DONALD ZAGAR, and
DANIEL ZASTROW,

      Plaintiffs,

v.                                                    Case No. 16-CV-361

INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE WORKERS,
DISTRICT NO. 10,
INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE WORKERS,
ROCK RIVER LODGE 2053, and
MAYSTEEL INDUSTRIES LLC (ALLENTON FACILITY),

      Defendants.

## DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The issue in this case is whether the date of either contract ratification or contract execution constitutes the date when a collective bargaining agreement is renewed, extended or modified for purposes of applying the Wisconsin right to work law. For the reasons discussed below, the Court holds that the date of contract ratification, demonstrating that a meeting of the minds has occurred, is the

operative date, not contract execution. Accordingly, defendants' motion for summary judgment will be granted and plaintiffs' motion for summary judgment will be denied.

I.  **Factual and Procedural Background**

The factual recitation that follows is derived from Plaintiffs' Response to Defendants' Findings of Fact ("PRDPFP"), ECF No. 40. It may read a little choppy, but the Court has tried to set out only facts that plaintiffs do not dispute.

   A.  **Negotiation of the 2015 CBA**

For many years, Maysteel Industries ("Maysteel" or "Company") and International Association of Machinists, District 10 and Rock River Lodge 2053 (collectively "Union") have been parties to collective bargaining agreements (CBAs) covering workers at the Allenton, Wisconsin facility. The prior CBA had effective dates from March 4, 2012, to March 4, 2015 (hereafter "2012 agreement"), and the new agreement has effective dates from March 2, 2015 to March 4, 2018 (hereafter "2015 agreement"). PRDPFP ¶ 1, ECF No. 40.

The Union sent a timely letter to Maysteel to negotiate a successor to the 2012 agreement. Negotiations over the 2015 agreement began in January 2015. A committee of bargaining unit employees, with the assistance of Business Representative Scott Parr bargained for the Union. Dave Dembinski, Kevin Matkin, Darci Boettcher and Mark Mertzig bargained for Maysteel. Dembinski was the Company's lead spokesman. *Id.* ¶ 2.

The Maysteel bargaining unit had a history of voting down contracts. When Parr began bargaining, he informed both the members and the Company that he intended to obtain ratification on the first vote no later than March 4th, the expiration date of the prior agreement. *Id.* ¶ 3.

The parties kept a "living document" (or "summary document") of tentatively agreed-upon proposals which were typically initialed or signed by Parr and Dembinski. Once all proposals were tentatively agreed upon, they were combined into a "tentative agreement." Negotiation regarding all items save the specifics of the break times were completed by February 27, 2015. *Id.* ¶ 4

During negotiations, the parties agreed to change from two breaks to one, and from a 20-minute lunch to a 30-minute unpaid lunch. There was never a contractual provision or proposal on when such breaks were provided. *Id.* Similarly, the 2012 CBA did not specify when breaks were to occur. *Id.* ¶¶ 6 & 8.

The company did not want to specify break times in the agreement but proposed that the Union poll employees, then the Union and company would agree from there. The tentative agreement stated that "the specific time of the rest period will be established by the company and the committee by April 1st of 2015." *Id.* ¶¶ 2 & 7.

Negotiations focused on changes to the existing CBA as had been the parties' tradition. They did not bargain from scratch. If no changes to the 2012 language were proposed, the existing language would be included in the next agreement. *Id.* ¶ 5.

All collective bargaining agreements negotiated by the Union are subject to ratification. After negotiations concluded, but prior to ratification, the tentative agreement was sent by Boettcher to Parr by e-mail. The Company also provided enough copies of the tentative agreement so that it could be distributed to the Union's membership at the ratification meeting. *Id.* ¶ 14.

The tentative agreement was submitted to the Union's membership on Saturday, February 28, 2015. Parr believed the Union had gotten everything that they could out of the Company and recommended that the membership ratify the agreement. *Id.* ¶ 17.

At the ratification meeting, Parr explained that the members were voting on the existing CBA as modified by the changes reflected in the tentative agreement. Before voting started, Parr explained all the changes included in the tentative agreement. He observed that no modifications had been made to the union security provisions during the negotiations and that the membership was ratifying the continuation of provisions of the prior agreement, which would include the union security provisions. Maysteel and the Union agreed that the new CBA would include all existing provisions of the 2012 agreement plus all changes to the language tentatively agreed upon during negotiations. After this explanation, the members ratified the contract on February 28, 2015. *Id.* ¶¶ 18 & 19.

Plaintiff Brace, at that time a Union member, attended the ratification meeting; the remaining plaintiffs, not being members of the Union, did not attend. *Id.* ¶¶ 13 & 20.

4

Either on February 28th or the next day, Dembinski asked Parr if they could make the new wage rates effective March 2nd. Dembinski indicated that the contract would have taken effect March 5th, but he agreed to pay the new wages for the entire week. March 2 was a Monday and the first day of the Company's payroll period. This early implementation allowed the Company to avoid calculating pay based upon two different rates for each employee in the same week. *Id.* ¶¶ 23 & 24.

On March 2nd, Parr also sent a letter to Maysteel indicating that the agreement had been ratified and attaching the agreement. Upon this notification, Boettcher put the wages into effect for Monday March 2, 2015. Boettcher believed that "you can't put anything in place until the contract's ratified." She used the agreed language changes document to adjust the rates. She also notified payroll to adjust short-term disability amounts and benefit percentages. *Id.* ¶¶ 25 & 26.

Following ratification, Darci Boettcher was responsible for doing the work necessary to put the ratified provisions into booklet form and for making sure that the final booklet reflected all the things that were negotiated. She took the existing contract and changed the language to reflect the changes negotiated by the parties. The changes were then proofread by Dembinski, Mertzig, Parr and the bargaining committee. *Id.* ¶ 27.

Between the date of ratification and the signing of the 2015 contract, Sarauer and Zastrow requested copies of the contract. Boettcher told plaintiff Sarauer that the Union and Company still had some things to "hash out." By this term, Boettcher meant that the parties would need to meet to ensure that all changes in the

5

tentative agreement were reflected in the final booklets. Other than setting specific break times, nothing else need to be "hashed out" by the parties. *Id.* ¶ 28.

The draft contract was completed on March 9, and the parties executed the agreement on March 18, 2015. *Id.* ¶¶ 29-30.

The specific break times were established on or around April 6, 2015. *Id.* ¶¶ 4 & 7.

### B. Union-fee checkoffs

Plaintiffs Sarauer, Bartsch, Brace, Captain, Engeleiter, Kubatzki, Leitzke, Stinemates, Zagar, and Zastrow are members of the bargaining unit represented by the Union. Prior to the 2015 negotiations, all of them except Brace resigned from the Union. As non-members of the Union, they were not entitled to attend Union meetings, contract proposal meetings, or to vote upon contract ratification. *Id.* ¶ 9.

As non-members, Plaintiffs annually received statements concerning calculations of fees they were obligated to pay pursuant to the union security clause. The annual statements reflected that they were paying fees to the Union through check-off. Prior to 2015, the Plaintiffs raised no objection about fees being deducted pursuant to check-off authorizations. The amount of Union dues deducted plaintiffs' pay correlated with their financial obligation to the Union. *Id.* ¶ 10.

On March 11, 2015, 2015 Wisconsin Act 1 was enacted into law. This statute, also known as the Wisconsin right to work law, made it unlawful for, among other things, companies to deduct union fees from the paychecks of non-union members. Wis. Stat. § 111.04(3)(a). It also amended Wis. Stat. § 111.06 to make it illegal for

an employer to contribute on behalf of its employees' financial support to a labor union or to encourage membership in a labor Union as a condition of employment. Wis. Stat. §§ 111.06(1)(b), (1)(c), and (3).

Once Plaintiffs Bartsch, Sarauer, and Leitzke learned that the 2015 collective bargaining agreement had been signed after the effective date of Wisconsin's right to work law, they began to seek ways to revoke their dues checkoff authorizations. In an e-mail message dated March 12, 2015, Bartsch wrote, on behalf of himself, Sarauer, and Zastrow, to the local Union's president requesting a copy of "our payroll deduction authorization cards." PRDPFP ¶ 31, ECF No. 40.

As of March 2015, Signed checkoffs exist for plaintiffs Bartsch, Captain, Engeleiter, Stinemeates, and Zagar. The Union has not been able to locate the checkoff authorizations for Brace, Kubatzki, Sarauer, Leitzke, and Zastrow. *Id.* ¶¶ 11 & 12.

When Maysteel and the Union did not respond to plaintiffs Bartsch, Sarauer, Leitzke, and Zastrow's requests for information about their checkoffs, they filed unfair labor practice charges against the Union with the NLRB. Among other things, these plaintiffs alleged, "Despite any evidence that Charging Parties ever signed or entered into any dues deduction authorization, the Union, without lawful authorization, continued collecting dues from Charging Parties' paychecks, and caused Employer to continue deducting and remitting dues from Charging Parties' paychecks." *Id.* ¶ 35.

7

During the NLRB proceedings, the Defendants were unable to produce the dues checkoff authorizations for Sarauer, Bartsch, Leitzke, Kubatzki, Brace and Zastrow. Each one of them acknowledges that the amount of dues deducted from their pay was the exact amount owed under the existing union security clause to the Union. During this lawsuit, the Union found the checkoff authorization for Bartsch. *Id.* ¶¶ 39-40.

There was a settlement of the charges negotiated by the NLRB. The settlement did not require that the union security provision in the collective bargaining agreement be rescinded or invalidated. *Id.* ¶ 38.

## II.     Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "If no reasonable jury could find for the party opposing the motion, it must be granted." *Hedberg v. Ind. Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). With cross summary judgment motions, the Court must "construe all facts and inferences in favor of the party against whom the motion under consideration is made." *Orr v. Assurant Emp. Benefits*, 786 F.3d 596, 600 (7th Cir. 2015) (citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)). Thus, "the court assesses whether each movant has satisfied the requirements of Rule 56." *Koger v. Dart*, 114 F. Supp. 3d 572, 576 (N.D. Ill. 2015) (citing *Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005)).

## III. Discussion

### A. The effect of the right to work law on the 2015 CBA

Wisconsin's right to work law "applies to a collective bargaining agreement containing provisions inconsistent with this act upon the renewal, modification, or extension of the agreement occurring on or after" March 11, 2015. 2015 Wisconsin Act 1 § 13. Because the right to work law makes illegal union security clauses and fee payments for non-Union members, and because plaintiffs contend that the 2015 CBA was not completed before March 11, the unlawful provisions should be vitiated.

So, the question is whether a "renewal, modification, or extension" of the 2015 CBA occurred before the effective date of the right to work law, March 11, 2015. Plaintiffs argue that, at the earliest, the 2015 CBA was modified on the date of execution, March 18, 2015. They cite two main line of cases, one dealing with how courts dealt with the Taft Hartley Act, and the other arising in the context of possible collusion by a union and employer to frustrate employees' representational wishes. For the reasons that follow, neither line is persuasive.1

As this Court previously found in denying remand, the issue here is one of contract formation. This is so because the effective date provision of the Wisconsin right to act law uses language redolent of formation: renewed, modified or extended.

---

1 Neither party presses the argument that the 2015 CBA's effective date (March 2 or March 5, 2015) should play a role in the analysis, and the Court agrees that it is irrelevant.

9

And contract formation is a question of "'federal common law, rather than the law of the state where the agreement is signed or performed.'" ECF No. 19, at 5, 7 (quoting *Mohr v. Metro East Mfg. Co.*, 711 F2d 69, 71 (7th Cir. 1983)). Under federal law, a "collective bargaining agreement need not be reduced to writing when the 'meeting of the minds' occurs." *Chauffeurs, Teamsters, & Helpers Local Union No. 771*, 2011 NLRB LEXIS 383, 16-17 (N.L.R.B. July 27, 2011).

Ratification, in which the union membership votes on whether to accept a CBA, is of critical importance in determining when the meeting of the minds takes place. As the Supreme Court of the United States observed, "the ratification vote . . . provide[s] overwhelming evidence that the parties reached a meeting of the minds." Similarly, the Third Circuit has explained that union "ratification is generally considered to be the last act necessary . . . to create a meeting of the minds and an enforceable agreement." *Mack Trucks, Inc. v. Int'l Union, United Auto.*, 856 F.2d 579, 592 (3rd Cir. 1988). The Seventh Circuit appears to agree, as it has held that a "signature at the bottom of the collective bargaining agreement itself is unnecessary." *Bricklayers Local 21 v. Banner Restoration, Inc.*, 385 F.3d 761, 767 (7th Cir. 2004).

As the NLRB long ago noted, "[o]f course, the contract in this case was 'oral,' more exactly 'parole,' only in a highly technical sense. Save for the missing signature, it was a complete written document, duly publicized to all interested parties at the time of its adoption, and proved by unimpeachable documentary evidence." *Teamsters Local 294 (Conway's Express)*, 87 NLRB 972, 976 n. 9 (1949).

Based on this reasoning, the NLRB has said that, once a meeting of the minds has occurred, the parties to a CBA are "required to execute a written collective-bargaining agreement" embodying the agree-upon terms regardless of intervening events. *Young Women's Christian Ass'n of W. Massachusetts & Int'l Union, United Auto., Aerospace & Agric. Workers of Am., Local 2322, AFL-CIO*, 349 NLRB 762, 763 (2007) (hereafter "*YWCA*"). The actual execution of a CBA is so insignificant to the formation issue that the Supreme Court has distinguished between "the mere act of signing an employment contract" with "the parties' express agreement on different terms." *Livadas v. Bradshaw*, 512 U.S. 107, 131 (1994).

Based on this authority, the Court finds that a meeting of the minds occurred on February 28, 1015, the date the Union ratified the 2015 CBA. Accordingly, the 2015 CBA does not fall within the requirements of the Wisconsin right to work law.

The Court is not persuaded by the two lines of authority put forward by plaintiffs. As to the Taft-Harley Act cases, which focused on execution dates, no one argued that an earlier ratification date should be used instead. Moreover, those cases all involved CBAs that were executed nearly a year or more after the June 1947 effective date of the Taft-Hartley Act, making it likely irrelevant whether the parties used execution date or ratification date. *See Spiegel*, 91 NLRB 647, 662 (1950 (CBA executed in December 1948); *United Hoisting Co.*, 92 NLRB 1642 (1951) (CBA executed in April 1948); *Salant & Salant, Inc.*, 87 NLRB 215, 216, 218 (1949) (CBA executed in November 1948).

The second line of authority is based on *Appalachian Shale Prods. Co.*, 121 NLRB 1160 (1958), in which a union ratified a contract that was later executed. Between ratification and execution, workers submitted an election petition, seeking different representation. The NLRB held that it applies a bright-line rules in such circumstances, allowing only fully executed CBAs to bar representation petitions, and allowed the election to proceed. *Id.* at 1161-62.

But the NLRB has cabined *Appalachian Shale* to its context. In *YWCA*, the parties had reached agreement on a CBA, but before execution, the employer received notice from a majority of its employees that they no wanted to be represented by the union. Based on this, the employer refused to execute the CBA and refused to recognize the union. 349 NLRB at 2. In so holding, the NLRB stated that the "rule of *Appalachian Shale*, that only a written agreement will bar the processing of an election petition, is essentially an effort to avert the danger that unions and employers may collude to defeat employees' representational wishes on the basis of illusory or fabricated agreements." *Id.* at 4.

The Board also noted that requiring "evidence of an executed, written agreement is designed to assure that employee rights are protected from such deception. Because collusion is not an issue when an employer unilaterally reneges on a final agreement and withdraws recognition, the policy considerations justifying the *Appalachian Shale* rule do not arise in this case." *Id.* Instead, based on principals of CBA formation, discussed above, the Board held that the existence of a

12

ratified, though unexecuted, CBA made the employer's conduct unlawful. *Id*. at 763 & n. 8.

In this case, there is no suggestion that the ratified 2015 CBA represented an "illusory or fabricated" agreement. Of equal importance, the Board made clear that *Appalachian Shale* "solely addresses the issue of employee decertification petitions." Given the consistent emphasis that courts and the Board has placed on ratification, versus execution, the Court can see no reason to extend the *Appalachian Shale* rule outside of its narrow field.

Finally, plaintiffs argue that the 2015 CBA falls within the purview of the right to work law because it was modified when the parties reached agreement on specific break times in April of 2015. But plaintiffs are confusing a CBA contract term with a working condition. Just as happened with the 2012 CBA, specific break times were not made a part of the 2015 CBA. In each instance, when the specific times were set, the record does not show that anything was done to amend or otherwise modify the CBA, or that a new execution ceremony took place, or that a new ratification vote occurred. If anything, the setting of break times under the 2012 and 2015 CBAs represented the faithful execution of a provision of those CBAs, not a modification.

### B. Plaintiffs' checkoff claims are preempted

The last claim is that Maysteel improperly deducted a union fee from plaintiffs' wages without authorization in violation of Wis. Stat. Ch. 109. Pursuant to Wis. Stat. §§ 109.03(1) and (5), "Every employer shall . . . pay to every employee

13

engaged in the employer's business . . . all wages earned by the employee" and "[e]ach employee shall have a right of action against any employer for the full amount of the employee's wages due on each regular payday as provided in § 109.11(2), in any court of competent jurisdiction." *See Kenosha Fire fighters, Local Union No. 414, AFL-CIO v. City of Kenosha*, 168 Wis. 2d 658, 665 (Wis. Ct. App. 1992) (indicating that policy goal of Ch. 109 is to ensure prompt payment of full wages).

It is certainly true that Maysteel and the Union have not been able to locate signed authorizations allowing Maysteel to deduct union fees from some of plaintiffs' wages. But plaintiffs have suffered no real harm, as no one disputes that Maysteel remitted all the money it withheld to the Union as union fees, which non-union employees were obligated to pay. Unlike the typical case covered by Chapter 109, the employer here did not gain a penny from its allegedly unlawful withholding.

Moreover, plaintiffs already filed an unfair labor practice charge with the NLRB, which was settled without reimbursement of deducted union fees, as payment of these fees would have, in the end, been the obligation of plaintiffs if they had not been deducted from their wages by their employer.

In any event, this state law claim is preempted. As far as the Court is aware, no court has applied Chapter 109 in this context, likely because "[i]t is by now a commonplace that in passing the NLRA Congress largely displaced state regulation of industrial relations." *Wis. Dep't of Indus., Labor & Human Rels. v. Gould, Inc.*,

14

475 U.S. 272, 286 (1986). Because of this displacement, states may not regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits, which includes subjects of mandatory bargaining such as a dues checkoff. *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 246 (1959).

There can be no question that deducting union dues without authorization is a matter that falls under federal labor law. *See Cushman & Wakefield, Inc.*, 2014 L.R.R.M. (BNA) ¶ 152867 (NLRB Div. of Judges Mar. 5, 2014). In seeking redress through NLRB charges for the same conduct alleged in Count III of the complaint, plaintiffs acknowledged the federal nature of their claim. Plaintiffs' remedy, if any, must come through federal labor law, not Chapter 109.

Nor does Wisconsin's right to work law change this dynamic, as recognized by our sister court in Madison: "Wisconsin's law regulating dues checkoff agreements does not come within the § 14(b) exception to federal preemption, and it is preempted both because it overlaps with, and is in conflict with, federal regulation under the LMRA." *Int'l Ass'n of Machinists Dist. 10 v. Allen*, No. 16-CV-77-WMC, 2016 WL 7475720, at *5 (W.D. Wis. Dec. 28, 2016), aff'd sub nom. *Int'l Ass'n of Machinists Dist. Ten & Local Lodge 873 v. Allen*, 904 F.3d 490 (7th Cir. 2018).

**NOW, THEREFORE, IT IS HEREBY ORDERED** that defendants' motion for summary judgment (ECF No. 33) is granted.

**IT IS ALSO ORDERED** that plaintiffs' motion for summary judgment (ECF No. 29) is denied.

**IT IS ALSO ORDERED** that plaintiffs' complaint (ECF No. 1-1) is dismissed with prejudice.

Dated at Milwaukee, Wisconsin, this 30th day of September, 2019.

**BY THE COURT:**

*s/ David E. Jones*

DAVID E. JONES
United States Magistrate Judge